**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **18-CR-382 (JEB)** |
| **LEON BRADY** | : | |

**DEFENDANT'S OBJECTION TO**
**PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

On June 23, 2018, Leon Brady was serving a sentence for a parole violation at the Hope Village Residential Reentry Center when he was transported to the hospital because he was experiencing chest pain. After being treated, he failed to return to Hope Village. He was arrested on a parole warrant three months later, on September 21, 2018. His parole was revoked, and he is now scheduled to be released on parole on December 6, 2019. While serving that sentence, a grand jury returned a one-count indictment charging Mr. Brady with escape from custody, in violation of 18 U.S.C. § 751(a), for his failure to return to the halfway house. On January 23, 2018, he entered a plea of guilty, and he will appear before this Honorable Court for sentencing on May 13, 2019. Mr. Brady respectfully objects to the calculations under the United States Sentencing Guidelines ("Guidelines") in the Presentence Investigation Report ("PSR"), and submits the following for the Court's consideration in determining an appropriate sentence based on the sentencing factors set forth in 18 U.S.C. § 3553(a). For the reasons that follow, Mr. Brady respectfully requests that the Court impose a sentence of concurrent time that will allow him to be released in this matter on the date that he is now scheduled to be released on parole.

## **Background**

For reasons that he still does not understand, Mr. Brady's mother abandoned him when he was around three years old.   She took him to her parents' house and suggested that they take him to his father's house, which was just down the street.   She left and never came back.   Also for reasons that he does not understand, Mr. Brady's grandparents refused to take him to his father's house, and instead insisted on raising him themselves, although they had 13 of their own children already living with them.   The years that followed were agonizing for Mr. Brady and were marked by deprivation—of his parents, of basic comforts and necessities, and of emotional security—and by abuse, both physical and mental, by his grandparents and by the many aunts and uncles with whom he was now living.

Mr. Brady lived in his grandparents' home like a second class citizen:   he did not have a bed but rather slept on the floor; there was no guarantee that he would get proper meals or even have enough to eat; worst of all, the only time anyone paid him any attention was when a member of the household was beating him or locking him in a closet.   Amid this abuse, Mr. Brady desperately wanted to see his father and spend time with him, but by his memory he was only able to sneak away and visit his father twice before he died when Mr. Brady was seven. Mr. Brady was not allowed to attend the funeral service for his father, and he felt deeply abandoned and alone.

As his feelings of abandonment and distress mounted, so presumably did his acting out, which prompted only harsher castigation.   The frequency and ferocity of the abuse he suffered escalated as he got older.   He was beaten with switches, extension cords and anything on hand; he was made to remove all his clothes before being beaten.   He was also increasingly locked in

2

the basement, the pantry, or the closet for hours at a time.   In his words, "it was like I was in training to go to prison."   He began to run away frequently, and each time that he was found and returned to his grandparents' home – which he called "the house of pain" – he was filled with a feeling of disappointment and dread.   He believed he would be safer living on the streets.

In short, Mr. Brady's young life was a struggle to survive, and not surprisingly, he became involved in the juvenile justice system.   When he was just twelve years old, he was committed to the D.C. Department of Human Services for a robbery while armed (with a rock). He spent the next five years in and out of juvenile facilities.   Life in the juvenile facilities was marked by abuse and a struggle to survive, just as his life at home was, but his life at home was so painful that on occasion he took responsibility for misconduct committed by someone else in order to get himself arrested and returned to a juvenile facility.   Between the ages of 15 and 17, he was committed to a facility in Florida.   While there was physical abuse at this facility too, he found relief in escaping his family home.

When he was released and returned from Florida, he feared returning to his family home and avoided it as much as possible.   He turned to drugs to help him cope and slept wherever he could find a place to stay warm.

When he was 18 years old, he was arrested for assaulting a man with a deadly weapon (a pole).   The man had attacked his cousin, and Mr. Brady retaliated.   For that assault, he was sentenced to probation, but the following year, his probation was revoked when he was arrested for a robbery.   Mr. Brady was arrested for the robbery after a "friend" gave him a multi-colored hat and a BB gun.   Mr. Brady was happy get these "gifts," but had no idea the friend had just committed a robbery with these items.   Both he and the other man were stopped by police a

short time later.   The other man was released, but Mr. Brady was charged with the robbery – because he was the man with the multi-colored hat.   He later entered a guilty plea to the robbery because his lawyer told him that he could not win at trial and his sentence would be only a two-year term.   Instead, he was sentenced to four to twelve years, and then a consecutive term of three to nine years for violating his probation.

He spent the following ten years in prison, and a whole new struggle to survive began. Mr. Brady served his sentence in a number of different prisons.   In each facility, especially those in the South, he found that prisoners from the District of Columbia were constantly pitted against prisoners from other locations.   Avoiding regional and race-based conflicts was nearly impossible.

As reflected in the PSR, Mr. Brady has been placed at Hope Village on a number of different occasions and has previously fled the halfway house, just as he used to flee his family home.   Each time he was remanded to the custody of the Bureau of Prisons, and this case represents the first time he has been charged with a criminal offense for failing to return to Hope Village.

The danger and insecurity that Mr. Brady has faced at Hope Village has, in many ways, been worse that what he experienced as a child at his grandparents' home or while in prison. From Mr. Brady's perspective, Hope Village is a constant struggle to survive – an unsafe environment where he was afraid to fall asleep.   On one occasion in 2015, guards at the front desk let armed men into the facility late at night.   These men came in chasing another man, who ran into an area where Mr. Brady was sleeping and jumped out of a window.   Because it was dark, the armed men mistook Mr. Brady for the other man and put a gun to his head.   The men

left when they realized Mr. Brady was not the man they were looking for.   When he complained

that these men had been let into the facility, the staff at Hope Village told Mr. Brady that they

were not responsible for his safety.   Mr. Brady left the halfway house the following day and did

not return.   This is just one example of the dangers Mr. Brady faced at Hope Village, but he

knows that whatever the dangers, he was at fault for leaving the facility.

The instant offense arose when Mr. Brady failed to return to the halfway house as

required on June 23, 2018.   He had less than a month to serve, with a presumptive parole date of

July 21, 2018, when he started experiencing chest pains.   Hope Village summoned an

ambulance, which took him to the hospital.   After he left the hospital, he began making his way

back to Hope Village.   As Mr. Brady neared Hope Village, he was approached by two young

men and held up at gunpoint.   These men took his cell phone, cigarettes and the little money he

had on him, and then warned him not to return to the neighborhood.   Immediately following the

robbery, Mr. Brady went to a friend's house instead of continuing on to Hope Village.   That

same evening he called Hope Village to report what had happened but was advised that he had

already been placed on escape status.   Mr. Brady struggled with what to do and knew he should

turn himself in, but he could not bring himself to do so.

Mr. Brady was arrested on September 21, 2018, and as a result of his failure to remain at

Hope Village, instead of a parole date of July 21, 2018, his new parole date was scheduled for

December 6, 2018 – requiring him to serve more than a year for his failure to return to Hope

Village, the conduct underlying the instant offense.

While detained, Mr. Brady completed an eight-week Substance Abuse Education

Program.   *See* Exhibit 1 (Certificate of Completion).   He also participated in the Transitional

Assistance Program (formerly the Re-entry program).   *See* Exhibit 2 (Letter from Robert

Greene, Transitional Assistance Program Unit Coordinator).   This program has given Mr. Brady

hope that he has never had.   He voluntarily participated in this program, and in return, he has

learned that there is hope for his future, if he puts in the effort to recover from the emotional and

physical abuse he suffered from as a child and to not let that abuse define him.   Participation in

this program has not been easy and has required him to learn to express himself and deal with is

emotions in a positive way.   Mr. Brady is determined to continue to work on these skills until

his release and to seek similar help after his release.   He recognizes that he will need guidance to

help him put his past behind him and build a productive life.   Counsel has informed Mr. Brady

of the re-entry court program before the Honorable Reggie B. Walton, and Mr. Brady asks that

this Court recommend him for participation in that program.

**<u>Argument</u>**

## I.        OBJECTION TO PSR GUIDELINES CALCULATIONS.

The guidelines for an escape offense are contained in U.S.S.G. § 2P1.1.   The base

offense level is a level 13 "if the custody or confinement is by virtue of an arrest on a charge of

felony, or conviction of any offense."   U.S.S.G. § 2P1.1(a).   The base offense level is "8,

otherwise."   *Id.*   Because Mr. Brady was in custody by virtue of a violation of his parole –

rather than a conviction – his base offense level is 8, not 13 as the PSR found.

In response to the defense objection to the use of base offense level 13, the Probation

Office noted that the Honorable John D. Bates found that a defendant serving a parole violation

sentence is in custody by virtue of a conviction and, therefore, the base offense level is 13.   *See*

PSR at 26 (citing *United States v. Gary Weems*, 18-cr-136 (JDB)).   However, in another matter,

6

the Honorable Amy Berman Jackson agreed with the defense position and rejected the notion

that the words "by virtue" applied to a seemingly non-ending chain of events, finding "[t]his

defendant has already served the sentence of incarceration imposed by virtue of his conviction.

So . . . unless some new circumstance had intervened, he would not be incarcerated".   *United*

*States v. Antonio Halfacre*, 18-cr-125 (ABJ), ECF No. 22 (transcript of sentencing proceedings)

at 26 (Sept. 25, 2018).     In doing so, Judge Jackson rejected Judge Bates's finding in *Weems*,

along with the holdings in cases cited by the Probation Office.   *See Id.* at 24-29; PSR at 26

(citing *United States v. Patterson*, 230 F.3d 1168 (9th Cir. 2000); *United States v. Evans*, 159

F.3d 908 (4th Cir. 1998); *United States v. Pynes*, 5 F. 3d 1139 (8th Cir. 1993)).

 This Court should do the same.   Mr. Brady was not at the halfway house due to a

conviction.   A defendant who is serving a supervised release or parole violate at a halfway

house is not be in the halfway house "by virtue" of a conviction, but rather "by virtue" of a

sentence for a supervised release or parole violation.   Terms of incarceration for parole or

supervised release violations are not sentences for the underlying conduct, but sentences for the

violation.   In fact, courts have found that when added to the original term of incarceration, it is

not unlawful for the term of incarceration imposed for supervised release violation to exceed the

statutory maximum for the underlying offense – because the supervised release violation

sentence is not a sentence for the underlying offense.   *See*, *e.g.*, *United States v. Wright*, 2 F.3d

175, 180 (6th Cir. 1993).   Similarly, Mr. Brady was not at the halfway house "by virtue" of a

conviction; instead, he was there as the result of a parole violation, pursuant to the D.C. Parole

Commission's authority to punish violations of parole.

 Under 2P1.1(b)(3), with the base offense level of 8, there is a 2-level reduction (rather

than a 4-level reduction) because the escape was from a halfway house, and then with the 2-level reduction for acceptance of responsibility, the resulting total offense level is 4.   As set forth in the final PSR, Mr. Brady is in criminal history category as V.   Thus, the applicable sentencing range is 4 to 10 months, a Zone B recommendation that authorizes the Court to impose a sentence of probation or supervised release that substitutes community confinement or home detention for any term of imprisonment.   *See* U.S.S.G. § 5C1.1(c).

## II.     SECTION 3553(a) FACTORS

Regardless of the Court's decision regarding the appropriate sentencing range, the sentencing factors set forth in 18 U.S.C. § 3553(a) support a sentence of time served.   When imposing a sentence, the Court must consider the Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).   In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, and mental and emotional conditions.   *See* 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582.   The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).   In this case, a sentence of time served is sufficient to serve these purposes.

**(1)      United States Sentencing Guidelines.**

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.   *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).   Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).   *Gall v. United States*, 552 U.S. 38, 50 (2007).   Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it.   *Rita v. United States*, 551 U.S. 338, 348, 350 (2007).   Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors."   *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).   Here, regardless of the applicable sentencing range (4 to 10 months or 12 to 18 months), the remaining § 3553 factors support a

sentence of six months concurrent with the time Mr. Brady is serving for the parole violation.

**(2) The Nature and Circumstances of the Offense.**

The sentence Mr. Brady is now serving is for the same conduct underlying the instant offense – failing to return to the halfway house as required.   Like many other defendants who fail to return to Hope Village when required, Mr. Brady made a rash decision in a moment of fear.   Thus, when considering the nature and circumstances of the offense, the conditions and dysfunction at Hope Village are worthy of the Court's consideration.

Hope Village has repeatedly failed to provide an environment that is designed to foster the success of its residents, and instead provides an environment that its residents must survive in order to complete their sentences.   Hope Village is a "Residential Reentry Center" purportedly designed "to provide assistance to inmates who are nearing release" and "help inmates gradually rebuild their ties to the community and facilitate supervising ex-offenders' activities during this readjustment phase."   *See* Bureau of Prisons, https://www.bop.gov/about/facilities/residential_reentry_management_centers.jsp (last visited Sept. 9, 2018).   In truth, it is a notoriously dangerous place located in a high crime area where many inmates do not feel—and, in fact, are not—safe, and do not get the assistance they need to rebuild their lives.   The staff at Hope Village consistently fail to fulfill their stated goal of helping inmates with their reentry into the community.   There have been multiple homicides in the immediate area of Hope Village and at least one stabbing on the premises.   Metropolitan Police Department records also indicate that, in 2018, 123 crimes were reported within 1500 feet of Hope Village, including 48 violent crimes (including a total of three homicides).   And that number reflects only those crimes which were reported to the police department.

Because residents at Hope Village are returning from periods of imprisonment, trying to break free from their past criminal wrongdoings and start anew despite severe reentry challenges, Hope Village is an easy (and well-known) target for continuing offenders to locate and threaten past nemeses.   Yet Hope Village does little, if anything, to protect its residents.   In 2016, the D.C. Corrections Information Council ("CIC") reported to the BOP that there were numerous concerns over safety at Hope Village:

> Current and former residents, in addition to community service providers, have informed the CIC that individuals do not feel safe traveling to and from Hope Village.   Movement and meals have been restricted frequently due to criminal activity in the area. Men have turned down the opportunity to be released from prison early to go to Hope Village because of the safety concerns.

Memorandum from CIC to Stefanie Skroch, BOP Contracting Officer, regarding RFP-200-1270-ES for Residential Reentry Center and Home Confinement Services (Sept. 7, 2016) at 7; *see also* Council for Court Excellence, Beyond Second Chances:   Returning Citizens' Re-Entry Struggles and Successes in the District of Columbia (Dec. 2016) at 16-17, *available at* http://www.courtexcellence.org/uploads/File/BSC-FINAL-web.pdf (explaining that MPD data confirms the "significant issue at Hope Village [of] the safety of its surroundings").   The December 2016 Council for Court Excellence ("CCE") report noted:

> One of the participants in CCE's focus group left the forum early because he was concerned about his safety returning to Hope Village after dark.   Many of the men expressed similar concerns about the safety of the neighborhood, asking "Have you been there?   It's rough."

*Id*. at 17.

Proof of the failures at Hope Village is in the escape statistics.   Hope Village is only a

300-bed facility.   *See* https://www.bop.gov/locations/rrc/index.jsp?contract=

15BRRC18D00000081 (last visited Sept. 9, 2018).   Yet, in 2018, the government charged more

than 60 defendants with escaping from Hope Village.   And these are only those who were

serving sentences and were charged – those who walked away pretrial were charged in Superior

Court, and not every person who failed to return as required or walked away without permission

was charged.   Although inmates are sent to Hope Village with little time remaining on their

sentences, numerous residents choose to walk away, rather than complete their short sentences,

knowing that they ultimately will have to return to the D.C. Jail or a Federal Correctional

Institution to complete their sentences.

      Residents and others refer to the halfway house as "Hopeless Village."   *See* Justin

Moyer, *To Some, D.C. Halfway House is More Like 'Hopeless Village,'* Wash. Post (Aug. 29,

2013).   A 2013 CIC report indicated that the halfway house "lacked the expertise to help

residents find housing and jobs and at times prevented residents from accessing mental health

assistance."   *Id.*   Local mental health advocates reported that "[r]esidents with mental illnesses

are not being provided appropriate alternative accommodations for their disabilities, resulting in

unnecessary disciplinary infractions, missed treatment appointments, altercations, rearrests, and

re-incarceration."   Hope Village Inspection Report, CIC (May 24, 2013) ("2013 CIC Report") at

33, https://cic.dc.gov/page/inspection; *see also Beyond Second Chances*, *supra*, at 19 (noting the

"concern [] that Hope Village does not provide adequate mental health services").   The report

further found that "the facility lacked an effective system to receive and adjudicate grievances."

Moyer, *supra*; *see also* 2013 CIC Report at 29 ("Grievances are not taken seriously; they are

ignored and may even be given to the individual staff member about which the grievance is

filed."). One former D.C. prisoner who spent time at Hope Village said, "The more you try to do what's right, the more they target you." Moyer, *supra*.

Though the government had not previously prosecuted similarly-situated people in this jurisdiction with felony escape in federal court, in late 2017, the United States Attorney's Office changed its charging practices. Between January 2006 and late September 2017, the government charged only two individuals in this district with violations of 18 U.S.C. § 751(a), one who escaped from a Department of Corrections transport van when being taken from the CTF detention facility to a medical facility, *see United States v. Terrence O. Moore*, 10-cr-099 (EGS), ECF No. 38, Statement of Facts (Mar. 10, 2011), and one who was released from a BOP facility to report to Hope Village, but failed to report, *see United States v. Melvin Taplet*, 17-cr-045 (RJL), ECF No. 10, Statement of Facts (June 12, 2017). During this time period, no defendant who was designated by the BOP to serve the remainder of a sentence at Hope Village, but failed to remain at the facility as required, was charged with escape in violation of § 751(a).[1]

On September 28, 2017, for the first time, the government charged two defendants with violations of § 751(a), for leaving and failing to return to the halfway house as required. *See*

---

[1] This statement is based on review of all criminal cases charged in this district from January 1, 2006, to January 1, 2019. Based on a review of all ECF reports, it appears that before September 2017, no defendant was ever – that is, even prior to 2006 – charged with a violation of § 751(a) based on a halfway house violation.

The government has previously represented that such defendants were charged in D.C. Superior Court. However, that is not accurate. Although defendants who were held pretrial at Hope Village and walked away without authorization consistently have been charged in D.C. Superior Court, except in unusual circumstances, defendants serving the remainder of their sentences at Hope Village have not. Undersigned counsel has confirmed with the District of Columbia Public Defender's Office that those charged in Superior Court have been defendants who were held pretrial, not defendants who were serving sentences and walked away.

*United States v. John Caudle*, 17-cr-178 (APM), ECF No. 1, Indictment (Sept. 28, 2017); *United States v. Lawrence Daniels*, 17-cr-180 (JEB), ECF No. 1, Indictment (Sept. 28, 2017).   In the remainder of 2017, the government charged two additional defendants with similar violations. *See United States v. Mossiah Parker*, 17-cr-183 (APM), ECF No. 1, Indictment (Oct. 3, 2017); *United States v. Edward Lee Reid-Peeler*, 17-cr-248 (TJK), ECF No. 1, Indictment (Dec. 19, 2017).   These were not the only defendants to leave Hope Village without permission or to fail to return to Hope Village as required in 2017, but were the only defendants charged in federal court that year.

Then, in February 2018, while continuing to not charge every defendant who walks away from Hope Village, the government began filing charges in federal court more frequently. Between February 13, 2018 (the first escape case charged in 2018), and the end of December 2018, the government charged more than 60 defendants with violating §751(a) in relation to Hope Village.   These defendants, who, unlike the many others who walked away from Hope Village without permission prior to September 2017, have now been charged with a federal felony offense and face up to five additional years of imprisonment.

The volume of these cases alone demonstrates that Hope Village is failing miserably at fulfilling its obligation to help inmates successfully reenter the community.   And the various explanations that the charged defendants have given for leaving the halfway house further confirm that the staff members at Hope Village are not fulfilling their role of assisting residents to transition into society and do not treat residents with respect and compassion.   *See, e.g.*, *United States v. George David Cook*, 18-cr-308 (DLF), ECF No. 12 at 5 (after being threatened at Hope Village defendant asked to be sent back to FCI Cumberland; defendant left Hope Village

14

after staff took no actions to ensure his safety); *United States v. Joshua Hubbard*, 18-cr-212

(APM), ECF No. 16 at 3-4 (defendant left Hope Village after staff refused to let him visit his

father after his father was diagnosed with stage four cancer and family reported his father's

condition was grave).   While the failure of Hope Village to fulfill its obligations does not excuse

Mr. Brady's failure to return to the halfway house, it is a relevant factor for the Court to

consider.

**(3) History and Characteristics of the Defendant.**

Mr. Brady recognizes that he has several prior convictions.   However, his involvement

with the criminal justice system was born out of his struggle to cope with the extensive physical

and psychological abuse he suffered as a child.   Recently, he has begun to learn the skills he will

need to overcome the persistent effects of that abuse.   He has taken advantage of the programs

offered at the Central Treatment Facility that will help him do this.   Additional time incarcerated

will not help him learn those skills or help him learn how to live a productive life.   A program

such as Judge Walton's re-entry program will give Mr. Brady the extra resources and support he

will need to succeed, and he asks that he Court give him the opportunity to participate in that

program.   A sentence of concurrent time, followed by a term of supervised release will allow

him to do so.

**(4) The Purposes of Sentencing and Need to Avoid Unwarranted Disparities.**

A sentence of concurrent time is appropriate because of the need to avoid unwarranted

sentencing disparities with individuals guilty of the same conduct throughout the country.

Defendants serving a sentence for a conviction in state or local court cannot be charged with a

federal escape charge anywhere else in the country.   Defendants sentenced in D.C. Superior

Court can be charged with escape in federal court only because they are deemed to be in the custody of the Attorney General—a necessary element to be convicted under 18 U.S.C. § 751(a). As stated by the Honorable Ketanji B. Jackson:   "My own takeaway from this unfortunate dynamic is that to sentence defendants in these escape cases *to any time at all* is actually to treat them differently and more harshly than defendants in other jurisdictions who could not have been charged for this infraction, much less sentenced."   *See United States v. Tyrone Brown*, 18-cr-380 (KBJ), ECF No. 19 (transcript of sentencing hearing) at 44-45 (Mar. 5, 2019) (emphasis added). Similarly, to account for this disparity, the Court should sentence Mr. Brady to a term of incarceration of no more than six months to run concurrent with the parole violation sentence that he is now serving.

Such a sentence also would avoid an unwarranted disparity between Mr. Brady and defendants sentenced in this jurisdiction, because time served would be consistent with many of the sentences that have been given in other escape cases.   A number of defendants sentenced for escape offenses have been sentenced to terms concurrent with sentences for other offenses, just as Mr. Brady requests.   *See United States v. Edward Anderson*, 18-cr-152 (CRC) (nine months concurrent); *United States v. Jarrell Harris*, 18-cr-028 (EGS) (21 months concurrent with new offenses); *United States v. Mossiah Parker*, 17-cr-183 (APM) (twelve months concurrent to 40-month sentence for burglary committed while on escape status); *United States v. Lawrence Daniels*, 17-cr-180 (JEB) (10 months concurrent with sentence in case before Eastern District of Virginia).   At least one defendant was sentenced to probation.   *United States v. Gary Weems*, 18-cr-136 (JDB).   Others have been sentenced to time-served (after having completed their underlying sentences).   *United States v. Joshua Hubbard*, 18-cr-212 (APM) (73 days); *United*

*States v. Gary Walker*, 18-cr-184 (KBJ) (approximately six weeks); *United States v. Matthias Onley*, 18-cr-183 (BAH) (approximately one month); *United States v. Vertis McCoy*, 18-cr-046 (RBW) (approximately one week); *United States v. John Caudle*, 17-cr-178 (APM) (approximately five months).   Still others have been sentenced to very short terms.   *See United States v. Tyrone Brown*, 18-cr-380 (KBJ) (one day); *United States v. Cook*, 18-cr-308 (DLF) (29 days); *United States v. Delonte Johnson*, 18-cr-159 (KBJ) (one month, the equivalent of time-served); *United States v. Antonio Griffin*, 18-cr-125 (ABJ) (two months); *United States v. Donnell Berry*, 18-cr-190 (RDM) (three months); *United States v. Quortez Veney*, 18-cr-149 (ABJ) (three months).[2]

A longer sentence is not necessary to deter Mr. Brady and is unlikely to deter others who

---

[2]   Many of the others who have been sentenced for escaping from Hope Village have received downward departures or variances.   *See, e.g., United States v. David Key*, 18-cr-281 (CRC) (sentencing range 18 to 24 months, sentenced to 9 months); *United States v. Jeremiah James*, 18-cr-160 (DLF) (sentencing range 15 to 21 months, sentenced to 5 months); *United States v. Michael Clayton*, 18-158 (RDM) (sentencing range 15 to 21 months, sentenced to 150 days); *United States v. Antoine Gibson*, 18-cr-154 (JDB) (sentencing range 8 to 14 months, sentenced to 6 months); *United States v. Sneed*, 18-cr-044 (KBJ) (sentencing range 15 to 21 months, sentenced to 12 months, one day).

The vast majority of defendants who received sentences within the guidelines range were sentenced by the Honorable Trevor N. McFadden and the Honorable Timothy J. Kelly.   *See United States v. Lonniel Peterson*, 18-cr-197 (TJK) (sentencing range 27 to 33 months, sentenced to 27 months); *United States v. Daquan Jackson*, 18-cr-150 (TNM) (sentencing range 27 to 33 months, sentenced to 27 months); *United States v. D'Andre Jackson*, 18-cr-123 (TNM) (sentencing range 8 to 14 months, sentenced to 8 months); *United States v. Timothy Hamlett*, 18-cr-089 (TJK) (sentencing range 12 to 18 months, sentenced to 12 months and one day); *United States v. Deondray Osborne*, 18-cr-043 (TNM) (sentencing range 12 to 18 months, sentenced to 14 months), *appeal filed*, No. 18-3066 (D.C. Cir.); *United States v. Edward Reid-Peeler*, 17-cr-248 (TJK) (sentencing range 4 to 10 months, sentenced to 7 months).

are similarly situated.   While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect."   *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice (May 2016) at 1-2.   Research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original).   Significantly, "the crime prevention benefit falls far short of the social and economic costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety," *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst. (Jan. 2016) at 21.

## Conclusion

All of the relevant sentencing factors support a sentence of six months concurrent with the sentence Mr. Brady is serving for his parole violation as a result of failing to return to Hope Village.   The punishment he received from the parole board is sufficient punishment for not reporting to Hope Village; he has been held since September 2018, and will not be released on parole until December 2019.   Mr. Brady has used this term of incarceration for self-improvement and to better prepare himself for success in society.   He is prepared to continue to seek the assistance he needs to work through the effects of his childhood traumas and make a productive life for himself.   For the foregoing reasons, and such other reasons as may be

18

presented at the sentencing hearing, a concurrent sentence of six months is sufficient but not greater than necessary to meet the purposes of sentencing.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____

Mary Manning Petras
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

19